IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EDWARDLEE JOHNSON, | ) | CASE NO. 1:16 CV 632 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| CHRISTOPHER LaROSE, Warden, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |

### INTRODUCTION

Petitioner Edwardlee Johnson, a prisoner in state custody, has filed in this Court a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions and sentences in *State v. Johnson*, Case No. CR-12-564315-B.  (Doc. No. 1.) Respondent Warden Christopher LaRose[1] has filed a return of writ.  (Doc. No. 6.)  Johnson has filed a traverse.  (Doc. No. 12.)

This matter is before the undersigned by an automatic order of reference under Local Rule 72.2 for preparation of a report and recommendation on Johnson's petition or other case-dispositive motions.[2]  For the reasons stated below, the Court recommends Johnson's petition be DISMISSED.

---

[1] Ed Sheldon is now the warden of the Ohio State Penitentiary, where Johnson is incarcerated.  (Doc. No. 6 at 1.)

[2] This case was transferred to the undersigned from Magistrate Judge Nancy A. Vecchiarelli upon her retirement.

**FACTUAL BACKGROUND**

Ohio's Eighth District Court of Appeals set forth the following facts underlying

Johnson's convictions:

{¶ 2} Cleveland police officer Carma Crosby testified that she was working with officer Greg King in the early morning hours of June 12, 2012, when they responded to a call for females fighting in the area of East 169th, Grovewood, and Ozark Streets. When they arrived, they were flagged down by a female, later identified as Dionne Green ("Green"), who told them her cousin had been shot. The officers then called for EMS. According to Crosby, Green stated during her on-scene interview that either "Ed or Capone" shot her cousin.

{¶ 3} Also responding to the call for females fighting was Cleveland police officer Edward Csoltko. He testified he saw a male, who was identified as Carlos Coates, lying in the doorway of the house. As he looked for shell casings around the house, Csoltko found a car key underneath the bushes in the front of the house that belonged to the Jeep parked in front of the house.

{¶ 4} Homicide Detective Melvin Smith responded to a call for a male shot on East 169th Street in Cleveland. He testified that he spoke with the responding officers, investigated the scene, and conducted on-scene interviews with Green and Joe Fussell ("Fussell"). As a result of those interviews, he learned the names of potential witnesses and suspects including, Tamera Coleman, "Capone," "Ed," and "Leon," whose street name was "Light Skin."

{¶ 5} After completing the investigation of the crime scene, he and partner, Detective Sandoval wanted to interview Peter Council, the owner of the Jeep Liberty that was parked at the crime scene. While in route to speak with Council, Detective Sandoval received a call from "Capone," whose real name is Miekal Gale. They learned that Gale was at University Hospitals and wanted to speak with them.

{¶ 6} According to Detective Smith, Council was surprised to see homicide detectives at his door and that his vehicle was involved in any situation. However, Smith testified that it appeared that Council already knew that his vehicle was not with Gale, who was the person he lent it to last. As a result of the interview with Council, Smith learned Council received instructions by Gale to report the car stolen. Smith further learned that both Gale and Tamera Coleman lived in the same apartment complex as Council.

{¶ 7} After interviewing Council, they went to Gale and Coleman's apartment and located Coleman. Smith described Coleman's appearance as being a "rough state of being, hair all over her head, somewhat intox[icated], and lethargic." Coleman

indicated to Smith that she expected to see them and agreed to go down to the Justice Center for questioning.

{¶ 8} Smith testified that Coleman was dishonest with them during questioning, specifically that she did not know of anyone named "Ed." After Coleman was advised of her constitutional rights, she agreed to continue talking with them, but the interview was terminated because Coleman continued being dishonest with them; Coleman was arrested.

{¶ 9} About an hour later, Smith learned that Coleman wanted to speak to him again. During this interview, Coleman stated she wanted to be honest and admitted that she knew "Ed," and that she considered him as her brother because of his relationship with her deceased brother. She further admitted that Gale was her live-in boyfriend, a fact which she previously denied.

{¶ 10} A few days after the interview with Green, Smith learned that "Light Skin's" real name was Leon Howard. He also learned that Fussell was not honest with him at the crime scene about his whereabouts that morning. Smith further testified that Fussell, Howard, and Gale all avoided giving the detectives a formal statement, and when Gale finally met with detectives, he was uncooperative, and his attorney was present.

{¶ 11} According to Smith, Howard was difficult to locate. It was not until Smith learned that Howard's father was a retired police officer and made contact with him were they able to interview Howard. This occurred in the winter of 2012   six months after the murder.

{¶ 12} Green testified that Coates was her second cousin but "like a brother." During her testimony, Green identified the witnesses to Coates's death. Coleman is the mother of Green's niece and had been dating and living with Gale. Green stated she knew Coleman for "years" and only knew Gale for one week prior to Coates's murder. Green also identified Fussell and Howard as friends, whom she knew for years. Green denied knowing Johnson.

{¶ 13} Green described the events leading up to Coates's death. She testified that earlier in the evening on June 11, 2012, she was at her house with Coleman, Howard, and Coates. They planned on going out while Coates stayed home to watch her and Coleman's children.

{¶ 14} As the evening progressed, Coleman and Green started "bickering" about "the past" and about Coleman "turning tricks" out of Green's house. Coates started getting involved in the conversation, which caused Coates and Green to exchange words. Although Green believed that they were "just playing around," a pushing and

slapping match began between the two, with Coates initiating the first contact and then Green hitting him with a shoe.

{¶ 15} During this commotion, Coleman told Coates to stop hitting Green or she would "kick his ass." Coates pushed Coleman against the wall and she was in his face and hitting him. Coates hit Coleman back, which prompted her to start yelling that he "wanted to fight like a bitch," so she was going to call her "brother." Coleman was heard on the phone screaming about Green and Coates.

{¶ 16} After the phone call, Green, Coleman, and Howard went to a bar, where Green and Coleman talked about the fight with Coates. During this conversation, Coleman received a telephone call and went into the bathroom to take the call. When Coleman did not come out of the bathroom, Green went into the bathroom and Coleman was still on the phone talking to someone who Green testified she did not know. According to Green, Coleman was "angry and hostile." After Green told her not to call anyone to her house, Coleman became "real hostile, eager, and mean." When questioned later by the police, Green told them that Coleman was talking on the phone with "Ed" and that she learned from Coleman that he was coming to Cleveland from Akron. "Ed" was identified as Johnson.

{¶ 17} They left the bar and Howard drove them to a gas station to find some drugs. Green testified that she left Howard's car and went across the street. When she came back, she saw Gale, Coleman, Howard, and Fussell standing near Gale's vehicle. Coleman sat inside Gale's vehicle, and Green sat in the front seat of Howard's car where she and Howard smoked with Fussell.

{¶ 18} When they arrived back at Green's house, Coates was standing on the front lawn of her house upset because no one brought him cigarettes. Green then walked up to the corner of Grovewood and East 169th Streets where Fussell had parked his truck. Green stated that after Coleman and Gale arrived, Coleman was upset with her because Fussell was there. Green testified that Coleman kept "walking up on her," so, "I hit her," which caused them to start fighting in the street. While they were fighting, Green saw a man walking toward her house, on the other side of the street. She stated she did not recognize the man, but described him as being "light-skinned, tall, dark clothing" and it "looked like he had something on his hip." Green initially though the man was coming to help, but about five seconds after the man walked by, she heard a gunshot. Green was able to break free from Coleman, and ran to her house with Coleman following.

{¶ 19} Green stated that when she got to her house, she saw Gale pacing back and forth in front of her house looking for his car key, and saw Coates lying in the doorway. Green testified that she knew Coates was injured, but just thought he was "knocked-out," and she did not at that time associate the gunshot with Coates's

injury. In fact, she tried lifting Coates to wake him. When she did this, Coleman approached her, said some words to her, and then hit her.

{¶ 20} After this altercation, Coleman, her children, and Gale left, and Green ran to call for help. On the porch of her friend's house, Green saw Howard for the first time since the gunshot was heard. Green testified that she used his phone, over his protest, to call 911. However, a police cruiser was driving up the street, so she flagged down the cruiser.

{¶ 21} Green testified that the unidentified man she saw walking was not Howard because of the male's walk. She further admitted that when she gave her initial interview to the police at the scene, she did not tell them about the unidentified man walking down the street before she heard the gunshot. According to Green, she never saw the unidentified man again.

{¶ 22} Fussell testified that he grew up with Coates, Coleman, and Green; he did not know Gale or Johnson, and met Howard for the first time in the early morning of June 12, 2012, after receiving a phone call from Green, who wanted money so she could buy PCP. He testified that he rode his bicycle to the gas station and when he got there, both Coleman and Green got out of Howard's car. Green then went to a friend's house on another street. While he waited for Green, Coleman had some words with him, and then she got into a Jeep that pulled up at the gas station. After Green returned, he, Green, and Howard smoked a PCP cigarette, and Green invited him back to her house.

{¶ 23} Fussell testified that he went home and then drove his truck to Green's house. When he drove by her house, he saw Coates standing in the driveway. According to Fussell, Coates had a serious look on his face like something was wrong. Fussell spoke briefly with Coates, who told him to "watch out for that car right there," pointing at a car parked up the street. After Fussell parked his truck on the corner of East 169th and Grovewood Streets, Green walked up to the corner. Fussell testified that Coleman arrived, jumped out of the Jeep, and immediately started fighting with Green.

{¶ 24} Fussell testified that when he heard Coleman and Green fighting, he was going to get out of his truck, but he saw somebody walk by the passenger side of his truck "like cocking a gun or something." He described the person as a male who was a little taller and heavier than him; and his skin complexion was a little lighter than his own. Fussell stated that he was aware of the gun because "I had guns before. I don't know, you just I just seen the gun. I seen him cock it or playing with it, whatever he was doing. He tucked it. He walked down the side of the house. Then a few minutes later, I had heard a gunshot."

5

{¶ 25} Fussell stated that after he heard the gunshot, he ducked down in his truck. When he looked up, he saw Coleman leaving the house with her children. According to Fussell, Green was upset stating that she could not "believe this girl brought this shit to her house. I can't believe she did this." After Green told him that Coates "was knocked out or something," Fussell tried to wake him up. As he was "tapping" at Coates, Fussell noticed a red mark on Coates's eye, like somebody had punched him.

{¶ 26} On cross-examination, Fussell admitted he did not give an official statement to the police until he was arrested in January 2013, even though he knew homicide detectives wanted to speak with him about Coates's murder. He stated that he did not want to get involved because he had no business being there that evening.

{¶ 27} Leon Howard ("Howard") testified he knew Coates for about a year and Green for two or three years. He "knew of" Fussell, but testified that he did not know Coleman, Johnson, or Gale.

{¶ 28} On the evening of June 11, 2012, Howard went to Green's house to pick up some belongings. When he arrived, Coleman and Coates were already there. Howard, although uncertain at times as his testimony progressed, stated that everyone was drinking but not getting along. He stated that Coleman, Green, and Coates were "all at each other" with Coleman and Green arguing and then Coleman and Coates physically fighting. Howard stated that when Coleman started hitting Coates, he had to break them up, and then suggested they go to the bar.

{¶ 29} Howard stated that he could see Coleman and Green were still arguing at the bar. According to Howard, the girls kept running in and out of the bathroom and Coleman was making calls to "Capone and to the defendant." When asked how he knew Coleman was calling Johnson, he responded, "cuz she was mad" and because "[Coates] had hit her." Howard further testified that Coleman was texting someone who was "coming up from Akron."

{¶ 30} Howard testified that they left the bar around 2:00 a.m. and went to a gas station where Coleman was meeting Gale, but later testified that they went to the gas station at the request of Green. Upon arriving at the gas station, Green left while Howard and Coleman waited in the car. About 30 minutes later, Gale drove up in a Jeep and Coleman got out of Howard's car, standing between the two vehicles. Howard testified that he kept asking Coleman why Gale was "mugging" him, meaning staring at him. Howard testified that he and Gale never spoke, but just stared at each other.

{¶ 31} Howard testified that while waiting for Green to return, he noticed that Coleman had left her cell phone in his backseat and that he fielded over 20 calls from Coates during the entire evening requesting that they bring him cigarettes. Once Green returned to the car, they drove back to Green's house.

6

{¶ 32} When they arrived, Coates was standing in the driveway "upset" because "they was coming to fight him." According to Howard, Coates knew that Gale and someone from Akron were coming to fight him because "Coleman told Coates that before leaving for the bar."

{¶ 33} Howard testified that Coates told him that he was watching a black Honda that was parked across the street up by Grovewood because "no one had gotten out the car yet." At this time, a Jeep pulled up, almost stopping in front of Green's house. After Howard told Coates that Coleman was in the Jeep, Coates ran toward the Jeep, but the driver pulled away causing Coates to chase after it. Howard testified that Coates stopped and walked back to the driveway. As Coates walked back, Howard told him it "ain't seem right," meaning "if they want to fight, they should fight." Howard testified the Jeep then came back down East 169th and stopped, parking right in front of Green's driveway.

{¶ 34} Gale stepped out of the Jeep, and according to Howard, was walking toward where the girls were fighting. Howard testified he noticed a male wearing a hoodie walking down the other side of the street toward Ozark Street. The male walked past Green's house, however when Howard noticed Gale walking toward them, he also noticed the male had turned around and was now walking over to them. Howard testified that Coates, who was still on the porch, started arguing with Gale, who was standing on the grass in front of the house. According to Howard, the male wearing the hoodie walked up, pulled the hood off his head, and asked Coates "you remember me?" Howard stated he could see the male's face and identified the male as Johnson.

{¶ 35} According to Howard, Coates and Gale stopped arguing, and Coates answered Johnson's question. Howard testified that his cell phone started ringing, and when he reached for his phone, Johnson pulled a gun, pointing it at Howard, who was standing next to Coates on the porch. When Howard identified that it was only his cell phone, Johnson pulled the trigger of the gun, but the gun jammed. According to Howard, Johnson then ran to the bushes on the side of the house, but Gale approached Coates and punched him the face, which started a wrestling match between them. Howard stated that Coates and Gale were fighting for about two minutes when he heard Gale scream and saw him fall on the grass. While not mentioning anything about a weapon during direct examination, Howard testified on cross-examination that Coates had a nine-inch knife and stabbed Gale.

{¶ 36} After Gale fell, Johnson re-emerged from the bushes, raising the gun. Howard yelled for Coates to run in the house, and as Howard ran into the house, he heard a gunshot and saw Coates's body drop to the floor. Howard admitted that he did not see who actually pulled the trigger and shot Coates, but denied that he shot him.

7

{¶ 37} After seeing Coates fall, Howard hid by the couch and called out to Coates. When Coates did not respond, Howard ran to the kitchen and hid by the stove, and then ran down into the basement and hid in a corner for 15 or 20 minutes. During that time, he could hear the kids running around upstairs and fighting between Green and Coleman. When he did not hear any more noise coming from upstairs, Howard went out the back door and ran through some yards toward Ozark Street. Howard testified that when he was hiding in some bushes, he saw Gale, Coleman, and her children walking down the street toward East 170th Street. Howard stated that he then got into his car and drove towards East 168th Street. Although he became more uncertain later in his testimony, Howard testified that he saw them get into a dark-colored car.

{¶ 38} Howard testified that he drove to a friend's house on East 168th Street and sat on the porch of the house, until Green ran to the house crying and stating she was scared because Coates "was dead." Rather than going with Green back to her house, Howard stayed on his friend's porch and called his attorney. After advising his attorney what had happened, he asked his attorney to call the homicide unit to see if they knew whether Howard was there at the scene. According to Howard, his attorney called him back and stated that they did not have his name in connection with Coates's death. Detective Smith verified that an attorney did call about Coates's death.

{¶ 39} Howard admitted that he did not voluntarily speak to the police about Coates's murder until December 2012, because he did not want to be involved. Howard admitted that although his father is a police officer, it was not until he was being threatened with an arrest warrant did he agree to talk to the police. Furthermore, he stated that he did not talk to his father about the murder, but admitted that when he told his aunt and uncle, who are also police officers, they advised him to "get rid of [Coleman's] cell phone" that was left in his car.

{¶ 40} Miekal Gale ("Gale") testified that on June 12, 2012, he had a case pending for felonious assault and domestic violence, for which he was ultimately placed on probation. Following the events of June 12, 2012, he was charged with obstruction of official business, assault, and trespassing. Gale admitted that he hoped in exchange for his testimony against Johnson, he would remain on probation, even if he pleaded guilty to the new charges.

{¶ 41} Gale testified that in the early afternoon of June 12, 2012, he drove Coleman to Green's house. He then went home but later went to a strip club with a friend until 2:00 or 2:30 a.m. Afterwards, he called Coleman who asked him to pick her up at a gas station. Gale testified that Coleman's demeanor was "calm, but drunk." After she got into his vehicle, Coleman told him that she and Coates had "gotten into it" and that Coates "put his hands on her." Gale testified that she explained the whole situation to him and that her "brother" was coming.

8

{¶ 42} Gale identified Coleman's "brother" as Johnson, whom he had met a couple of times. Gale stated that he was skeptical that Johnson was really her "brother" in a familial sense. He described his relationship with Johnson as not a personal one; he only spoke to Johnson when he would call looking for Coleman. Gale also denied having a falling out with Johnson after suspecting that Johnson and Coleman's relationship was something more.

{¶ 43}  Gale testified that when he asked Coleman why she called Johnson, she responded:

> A: She saying he need to come [f * * k] him up. He need to learn a lesson.
>
> Q: And who is she referring to?
>
> A: Carlos.

{¶ 44} Gale testified that while they were driving over to Green's house, Coleman used his cell phone to call Johnson because she left her phone in Howard's car. Based on those conversations, Gale testified that he had reason to believe that Johnson was on his way from Akron, but it was not his intention to meet up with Johnson to approach Coates or for Johnson to be his "back up." However, on cross-examination, he testified that he was surprised to see Johnson at Green's house.

{¶ 45} When they arrived at East 169th Street, Gale approached Coates, who was sitting on the porch, and asked him what happened between him and Coleman. Gale stated that he got upset when Coates told him to mind his own business. Gale then walked up from the lawn and slapped Coates in the face, which caused Coates to start "swinging back." Gale testified that when he heard a gun cock, he turned and saw Johnson, who was wearing a red hoodie, standing beside him on his right, but facing Coates.

{¶ 46} Gale started backing up towards his car when he saw Johnson cock the gun, raise it, and pull the trigger, but the gun jammed. According to Gale, Howard ran inside the house, but Coates "started mouthing off, saying that this is some bitch ass shit, you a bitch ass [n* * *a]." He then saw Johnson go behind some bushes, and he could hear Johnson trying to unjam the gun. Gale testified that he then heard a gunshot when he was by the driver's side of his vehicle. At that point, Gale realized he had been stabbed.

{¶ 47} Gale denied bringing a firearm to the scene or shooting Coates. He stated that when he heard the gunshot, he ducked, and after rising up, he did not see anyone. Gale testified that he just wanted to leave but realized he did not have his car key.

When he went by the porch to look for his key, he saw Coates laying in the doorway and thought "that man might be dead." But instead of checking on him, he continued looking for his car key.

{¶ 48} Gale testified that Coleman and Green came running up from the corner; both entering the house by stepping over Coates's body. According to Gale, Coleman and Green got into a verbal altercation that turned into a scuffle by the doorway where Coates was lying. Gale testified that Johnson drove up in a dark colored car in front of Green's house. Both he and Johnson yelled for Coleman "to come on." Gale testified that because Coleman was taking so long, Johnson drove off, heading toward Ozark Street.

{¶ 49} Gale testified he started walking, with Coleman and the kids following him, heading toward where Johnson was parked. After getting into Johnson's car, he and Johnson had a conversation about what happened.

A: I told him that I think you shot him.

Q: All right. Does Ed respond to you?

A: Yes.

Q: What's his reaction to that?

A: He said that   he asked me did I shoot   did he shoot him. I said it's a possibility that you shot that man and that man is dead.

Q: All right. What was Ed's reaction to that?

A: He said, I only shot one time.

Q: I'm sorry?

A: I said he only shot   fired a shot one time.

Q: What's your reaction? Did you respond to that?

A: I'm like, I think that one shot killed him.

Q: All right. Does Ed have a reaction to that?

A: Yes.

Q: What's he say?

10

A: That he ain't mean to do it if that's what happened.

Q: Does Ed seem to be

A: Remorseful?

Q: Anything like that, remorseful, sorrowful, excited, mad, glad or sad?

A: He didn't seem like he was happy.

Q: All right.

A: He seemed like he was in a   like what did I do, what did she   kinda' like what did I get myself into. I didn't mean for it to happen that way.

{¶ 50} According to Gale, Coleman, who was seated in the back seat with her children, was "hyper, pumped up." Gale told Coleman to call and report that someone got shot on East 169th Street. According to Gale, Coleman called the police, but she told the police that she had been raped and that someone could be dead or shot in the East 169th area. However, Detective Smith testified that no calls were received reporting a shooting.

{¶ 51} Gale testified that Johnson drove about five streets away and then stopped to retrieve the gun, which was hidden in the grass. Johnson placed the gun under the hood of the car and drove to Gale and Coleman's residence.

{¶ 52} Once they returned home, Gale, although wheezing and out of breath, walked to a gas station to buy a cigar, peroxide, and alcohol to treat his stab wounds. He also threw his bloody clothes into a dumpster at a nearby plaza, which were never recovered. His brother eventually took him to University Hospitals for medical treatment where he gave the nurse false information about his identity and his injuries.

{¶ 53} Gale testified that while at the hospital, he called Detective Sandoval to tell him what had happened so he would not "be affiliated with something he had nothing to do with." Gale admitted that he was motivated to call the police after he learned that Coleman was being detained by police.

{¶ 54} Gale admitted that when he first met with detectives, he lied that he did not get into the vehicle with Johnson in order to protect himself. Gale also admitted he was not truthful with his uncle, who owned the Jeep. He initially testified that he did

11

not speak to his uncle until after he was released from the hospital, but then remembered that he spoke to him while walking home from the gas station after getting his medical supplies. Gale testified that he told his uncle to report the Jeep stolen because he could not find the key and it would further distance himself from the crime.

{¶ 55} On cross-examination, Gale initially denied that he spoke with Johnson over the phone that evening. However, after being shown his cell phone records, he admitted that he spoke to Johnson. According to his phone records, Gale called Johnson on the evening of June 11, 2012, at 11:35 p.m. and then in the early morning hours of June 12, 2012, at 12:14 a.m., 12:16 a.m., 12:27 a.m. and 12:48 a.m. Additionally, according to the phone records, Gale called Coleman's phone multiple times when she was sitting with him in his car at the gas station even though her cell phone was in Howard's vehicle.

{¶ 56} Dawnteasha Crumedy testified that she knew Coates for 15 to 20 years and he is the father of one of her children. She also stated that she had known Coleman for over 20 years and described her as her best friend. Crumedy testified that she knew Johnson through Coleman, and knew of him as Coleman's brother, which she accepted as true. She testified that when she spoke to Coleman after Coates's death, their conversation was not pleasant   they were hollering and screaming at each other. Crumedy also testified that she spoke with Johnson after her conversation with Coleman, and that he wanted to know where both Coleman and Gale were. Johnson also wanted to speak with her, which she agreed to arrange; however, she called the police instead.

{¶ 57} Denise Novak, Johnson's fianceé, testified that on the evening of June 11, 2012, Johnson left their house to go out with his friends. She stated she could not reach Johnson through calls or text messages that entire evening and into the early morning of June 12, 2012, which upset her because he was out late and he was using her car, a black Chevy Impala.

{¶ 58} When he came home, Johnson explained to her that in the early morning on June 12, 2012, he picked up Coleman and her children. He kept saying that Coleman was "crazy," "he was tired of her stuff," and that he "didn't want any part of it." On cross-examination, she stated that Johnson did not pick them up because of Coleman calling; rather, it was when Gale called him and asked him for a ride because he could not find his car key. She further admitted that they "have given [Gale] and [Coleman] rides before because they always need your help to get out of stuff."

{¶ 59} As her testimony progressed, she stated that Johnson told her that Gale had gotten stabbed, was having trouble breathing, and bleeding in her car. But that Johnson never said anything to her about someone being dead. She stated that no examination was done of her vehicle, which Detective Smith confirmed.

12

{¶ 60} Novak testified that a week later, Johnson's father called stating that Johnson was on the television regarding the murder of Coates. This was the first time, according to Novak, that Johnson learned that someone had died. Johnson turned himself in a few days later.

{¶ 61} Tamera Coleman ("Coleman") testified on behalf of the State and admitted she had been charged with the same offenses as Johnson, but entered into a deal where she would be pleading guilty to manslaughter in exchange for testifying against Johnson.

{¶ 62} Coleman testified that Johnson is like a brother to her, who she has known for 10 years and whom she met through her late older brother. She further testified that she knew Green, Coates, and Fussell for about 15 years. She stated she met Howard on the night of the murder and that Gale was her boyfriend of three years.

{¶ 63} Coleman told the jury her version of events about the evening of June 11, 2012, and early morning of June 12. She testified that Gale had someone drive her over to Green's house earlier in the day. Green became upset with Coates and when the argument turned physical, Coleman broke up the fight. However, Coates started fighting with her and then she and Green began fighting. Coleman testified that Coates put his hands on her by punching her with his fists and she defended herself. She said she felt disrespected and mad because she was only trying to break up a fight between him and Green.

{¶ 64} According to Coleman, Green wanted Coates to leave her house because of all the fighting but he refused. Coleman wanted to leave Green's house, but Howard refused to take her and her children home; therefore, she called Johnson. Coleman told the jury that she told Johnson that she got into an altercation with Coates and that she needed someone to come pick her and her children up at Green's house.

{¶ 65} Coleman testified that they left for the bar around 2:00 a.m. and she went to the bar to wait for Johnson. She stated that while at the bar, she called Johnson to make sure he was coming to pick her up, and she and Green were discussing what happened with Coates.

{¶ 66} During this time, Gale had called her and was upset that she went out. She told Gale that she got into an altercation with Coates, but that Johnson was coming to pick her and the kids up. Gale responded that he wanted her to stay where she was and that he would come for her. She told Gale they were going to a gas station so Green could meet up with Fussell. According to Coleman, because Gale told her that he would call Johnson and tell him that he was picking her up now, she did not call Johnson. Coleman stated that Gale and Johnson were not friends, but social. She

13

denied that Gale ever questioned her relationship with Johnson, until this incident happened.

{¶ 67} Once at the gas station, Coleman sat in Howard's car until Gale drove up in a Jeep. According to Coleman, everyone followed each other back to Green's house. Coleman denied that she ever called Johnson from Gale's cell phone. She testified that the last time she talked to Johnson was when she was at the bar. She testified she assumed Gale called Johnson and told him not to come up; she had no idea that Johnson was still coming to Cleveland. However, when they arrived on East 169th Street, Coleman saw Johnson's car parked on the street. Even though Johnson was parked by Fussell's truck, and Coleman spoke briefly to Fussell, she did not talk to Johnson.

{¶ 68} Coleman testified that she went inside to get her children while Gale stayed in the Jeep. According to Coleman, Green approached her and asked her why she was leaving. Coleman stated that she pushed Green stating that she was too drunk to remember what happened, and they started pushing and tugging each other.

{¶ 69} Coleman stated she was able to walk away and walk to Green's house. She believed Johnson was still in his car, and she saw Coates and Gale were on the porch. Once inside the house, she and Green got into another physical altercation. She testified that after breaking loose and getting her children, she came downstairs and saw Coates lying in the doorway. She denied hearing a gunshot.

{¶ 70} At that point, Johnson and Gale were in the truck, so she got in with her kids and they left. When asked about the black Chevy Impala owned by Johnson's fianceé, Coleman stated that Johnson picked them up in his green Chevy Suburban. Coleman testified that she asked Gale and Johnson what happened, and Gale told her, "Carlos stabbed him, and Edward shot him"; Johnson was not really saying anything. She testified she called the police and told them there was an altercation, which Detective Smith stated the police never received.

{¶ 71} Coleman denied that her testimony in court was different than what she told the detectives; however, she subsequently admitted she told the detectives and the prosecutor that Johnson admitted that he shot Coates. Coleman could not explain why she did not tell the jury that Johnson made this admission, but after being pressed, she testified that Johnson stated in the car that he shot Coates.

{¶ 72} Coleman admitted that she does not know what happened on the porch, but denied that she ever called Johnson for him to murder Coates and stated that she never saw Johnson get out of his car.

{¶ 73} Coleman admitted she still loved Gale, intended to stay with Gale, and that she still talked to Gale. When asked whether Gale killed Coates, she responded "I

don't know about that because I was not out there. I only know what I was told. I don't know that. I don't know what happened outside." When asked what she was told she responded:

> A: That Edward shot Capone and Capone   and Carlos stabbed Capone.
>
> Q: Right. And who   tell us again who the words   whose mouth did it come out of?
>
> A: Edward said that and Capone did.
>
> Q: Said what? What did Edward say to you?
>
> A: Edward said that he   Ca   Carlos stabbed Capone, and he shot him.

{¶ 74} Dr. Krista Pekarski, who conducted Coates's autopsy, testified that the proximity of the gun to the entrance wound was at an indeterminate or distance range   beyond a couple of feet. Dr. Pekarski testified that the bullet was recovered from the victim's cerebellum and that the trajectory of the bullet, based on the entrance wound and where the bullet was recovered, was from left to right, from the front of the head to the back of the head, and slightly upward. On cross-examination, Pekarski clarified that the she stated "slightly upward" because the bullet was recovered from the brain after it was removed; therefore, there was no way to do an exact measurement. But anatomically speaking, she was able to determine the angle as "slight." She further testified that the trajectory angle of the bullet was not beyond 20 degrees   "slight incline" and "not a lot of deviation in the up and down plane."

*State v. Johnson*, No. 99715, 2014 WL 2809013, at *1-12 (Ohio Ct. App. June 19, 2014).

These facts "shall be presumed to be correct," and Johnson has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1);

*Warren v. Smith*, 161 F.3d 360-61 (6th Cir. 1998).

**PROCEDURAL BACKGROUND**

### A.    Trial Court

On August 6, 2012, the Cuyahoga County Grand Jury indicted Johnson on the following

five counts:  (1) one count of aggravated murder in violation of Ohio Rev. Code § 2903.01(A)

15

(Count 1); (2) one count of murder in violation of Ohio Rev. Code § 2903.02(B) (Count 2); (3) two counts of felonious assault in violation of Ohio Rev. Code §§ 2903.11(A)(2) and (A)(1) (Counts 3 and 4, respectively); and (4) one count of having weapons under disability in violation of Ohio Rev. Code § 2923.13(A)(2) (Count 5).  (Doc. No. 6-1, Exh. 1.)  Counts 1 through 4 carried both one-year and three-year firearm specifications, as well as notice-of-prior-conviction and repeat-violent-offender specifications.  (Doc. No. 6-1, Exh. 1.)  In the same indictment, Tamera Coleman was charged with one count of having weapons under disability.  (Doc. No. 6-1, Exh. 1.)  Johnson entered pleas of not guilty to all charges.  (Doc. No. 6-1, Exh. 2.)

Prior to trial, Johnson moved to separate his and co-defendant Coleman's trials.  (Doc. No. 6-1, Exh. 3.)  The trial court granted the motion.  (Doc. No. 6-1, Exh. 4.)  Johnson also waived a jury trial on the prior-conviction and repeat-violent-offender specifications and the charge of having weapons under disability.  (Doc. No. 6-1, Exh. 5.)

The case proceeded to a jury trial on March 11, 2013.  (Doc. No. 6-1, Exh. 24 at 245.) On March 15, 2013, the jury found Johnson not guilty of aggravated murder and guilty of murder and both counts of felonious assault with attached specifications.  (Doc. No. 6-1, Exhs. 7, 8.)  On March 22, 2013, the trial court found Johnson guilty of the prior-conviction and repeat-violent-offender specifications and the weapons-under-disability charge.  (Doc. No. 6-1, Exh. 9.)

On March 25, 2013, the court imposed the following sentences:  fifteen years to life in prison for the murder charge, into which both felonious assault charges were merged; three years' imprisonment for having weapons under disability; four years' imprisonment for the repeat-violent-offender specifications; and three years' imprisonment for the firearm specifications, which it merged.  All sentences were to be served consecutively to the sentence

16

for murder, for an aggregate sentence of twenty-five years to life in prison.  (Doc. No. 6-1, Exh. 10.)

**B.     Direct Appeal**

Johnson, through counsel, filed a timely appeal to the Eighth District Court of Appeals. (Doc. No. 7-1, Exh. 11.)  In his appellate brief, he raised the following assignments of error:

1.     The trial court erred in entering a conviction which was against the manifest weight of the evidence, in violation of Defendant's right to due process of law, as protected by the 14th Amendment to the United States Constitution.

2.     The trial court erred in the admission of evidence, in violation of Defendant's right to confront witnesses, as protected by the 6th and 14th Amendments to the United States Constitution.

3.     The trial court erred in instructing the jury on Defendant's alleged flight.

4.     The trial court erred in failing to grant a mistrial due to prosecutorial misconduct, in violation of Defendant's right to due process of law, as protected by the 14th Amendment to the United States Constitution.

5.     Defendant was denied the effective assistance of counsel, in violation of his right to counsel, and Defendant's right to due process of law, as protected by the 6th and 14th Amendments to the United States Constitution.

6.     The proceedings below denied Mr. Johnson of his right to a fair trial under his 5th, 6th, and 14th Amendments to the United States Constitution, because of cumulative errors committed during the trial of this case.

(Doc. No. 6-1, Exh. 12 (capitalization altered).)  The State filed a brief in response.  (Doc. No. 6-1, Exh. 13.)

On June 19, 2014, the Ohio appellate court affirmed the trial court's judgment.  (Doc. No. 6-1, Exh. 15.)  Johnson moved for reconsideration of his second assignment of error.  (Doc. No. 6-1, Exh. 16.)  The State opposed the motion.  (Doc. No. 6-1, Exh. 17.)  The court of appeals denied the motion on July 22, 2014.  (Doc. No. 6-1, Exh. 18.)

17

Johnson, through counsel, filed a timely appeal of the appellate court's judgment to the Ohio Supreme Court. (Doc. No. 6-1, Exh. 19.) In his memorandum in support of jurisdiction, he set forth the following propositions of law:

1.    The Defendant's constitutional right to due process of law is denied when the trial court enters a judgment of conviction when it is against the manifest weight of evidence.

2.    The Defendant's right to due process of law as protected by the 14th Amendment to the United States Constitution is denied when the trial court denies a motion for mistrial based on prosecutorial misconduct.

3.    The Defendant's right to confront witnesses, guaranteed by the 6th and 14th Amendments to the United States Constitution, is denied when the trial court erroneously admits evidence highly prejudicial to the Defendant.

4.    The Defendant's constitutional right to the effective assistance of counsel as guaranteed by the 6th and 14th Amendments to the United States Constitution was denied by the deficient performance of trial counsel.

5.    The Defendant's constitutional right to due process of law was denied when the trial court improperly instructed the jury on flight.

6.    The Defendant's right to due process of law guaranteed by the 5th, 6th and 14th Amendments to the United States Constitution [was] denied due to the cumulative errors committed during trial.

(Doc. No. 6-1, Exh. 20 (capitalization altered).)

The Ohio Supreme Court declined jurisdiction over the appeal on February 18, 2015. (Doc. No. 6-1, Exh. 21.)

C.    **Post-Conviction Proceedings**

On April 15, 2015, Johnson, acting *pro se,* filed a motion in the trial court to vacate court costs. (Doc. No. 6-1, Exh. 22.) The court denied the motion. (Doc. No. 6-1, Exh. 23.)

## FEDERAL HABEAS CORPUS

Johnson, through counsel, filed the petition for writ of habeas corpus now before this

Court on March 14, 2016.  (Doc. No. 1.)  The petition asserts the following four grounds for

relief:

1.  The admission of hearsay evidence was in violation of defendant's right to confront witnesses against him a guarunteed [*sic*] by the 6th and 14th [A]mendments to the United States Constitution.

2.  [T]he repeated acts of misconduct by the prosecutor in the presence of the jury went virtually unchecked by the trial court.  The remarks did mislead the jury.  The remarks were extensive.  The improper comments were made during the closing rebuttal after defense had opportunity to addres [*sic*] them.  The repeated and purposeful acts here require a new trial.

3.  Trial counsel was ineffective in . . . fail[ing] to object to inadmissable [*sic*] evidence, . . . failing to object to the jury instructions on flight[,] . . . [and]failing to object to State's closing argument[,] .

4.  The combination of errors by the trial court, the prosecution and the ineffectiveness of the defense counsel deprived Johnson of a fair trial.

(Doc. No. 1-1 at 8, 12, 13, 14.)

On May 27, 2016, Respondent filed a return of writ.  (Doc. No. 6.)  On July 15, 2016,

Johnson moved to hold these proceedings in abeyance while he exhausted state-court remedies.

(Doc. No. 8.)  Respondent opposed the motion.  (Doc. No. 13.)  On August 1, 2016, Johnson

filed a traverse.  (Doc. No. 12.)  On August 4, 2016, Johnson filed a motion to supplement the

record.  (Doc. No. 14.)  On December 19, 2016, this Court denied Johnson's motion for stay and

abeyance and motion to supplement the record.  (Doc. No. 15.)

STANDARDS OF REVIEW

A.      AEDPA Review

Johnson's petition for writ of habeas corpus is governed by the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"), as it was filed after the Act's 1996 effective

date.  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Murphy v. Ohio*, 551 F.3d 485, 493 (6th Cir.

2009).  AEDPA, which amended 28 U.S.C. § 2254, was enacted "to reduce delays in the

execution of state and federal criminal sentences, particularly in capital cases, and 'to further the

principles of comity, finality, and federalism.'"  *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)

(quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)).  The Act "recognizes a

foundational principle of our federal system:  State courts are adequate forums for the

vindication of federal rights."  *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).  It therefore "erects a

formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in

state court."  *Id.*

One of AEDPA's most significant limitations on district courts' authority to grant writs

of habeas corpus is found in § 2254(d).  That provision forbids a federal court from granting

habeas relief with respect to a "claim that was adjudicated on the merits in State court

proceedings" unless the state-court decision either:

> (1)      resulted in a decision that was contrary to, or involved an unreasonable
>          application of, clearly established Federal law, as determined by the Supreme
>          Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable determination of the
>          facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original). A state court has adjudicated a claim "on the merits," and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision. *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

"Clearly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "only the holdings, as opposed to the dicta, of [Supreme Court] decisions." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted). The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). And a state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). And "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 134 S. Ct. at 15; *see also Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Supreme Court has cautioned, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt*, 134 S. Ct. at 15 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under de novo review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."). Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102-03 (internal quotation marks omitted). Thus, a petitioner "must show that the state court's ruling . . .

was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.  This is a very high standard, which the Court readily acknowledges: "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 102.

### B.    Exhaustion and Procedural Default

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus.  28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982).  This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982).  It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is a related but "distinct" concept from exhaustion. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  Procedural default occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to:  (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87

(1977); *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806.  In determining procedural

default, the federal court again looks to the last explained state-court judgment.  *Ylst*, 501 U.S. at

805; *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).

Where a state court declines to address a prisoner's federal claims because the prisoner

has failed to meet a state procedural requirement, federal habeas review is barred as long as the

state judgment rested on "independent and adequate" state procedural grounds.  *Coleman v.*

*Thompson*, 501 U.S. 722, 729 (1991).  To be independent, a state procedural rule and the state

courts' application of it must not rely in any part on federal law.  *Id.* at 732-33.  To be adequate, a

state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts

at the time it was applied.  *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).

A petitioner also may procedurally default a claim by failing to raise the claim in state

court, and pursue the claim through the state's "ordinary appellate review procedures," if, at the

time of the federal habeas petition, state law no longer allows the petitioner to raise the claim.

*Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282

F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the

state courts] cannot be considered in a federal habeas corpus petition.").  Under these

circumstances, while the exhaustion requirement is technically satisfied because there are no

longer any state-court remedies available to the petitioner, the petitioner's failure to have the

federal claims fully considered in the state courts constitutes a procedural default of those

claims, barring federal habeas review.  *Williams*, 460 F.3d at 806 ("Where state court remedies

are no longer available to a petitioner because he or she failed to use them within the required

time period, procedural default and not exhaustion bars federal court review."); *see also Gray v.*

24

*Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue - not merely as an issue arising under state law.'" *Id.* (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman*, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id.* "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

## C.    Cognizability

To the extent that claims asserted in federal habeas petitions allege state-law violations, they are not cognizable on federal habeas review and should be dismissed on that basis. "It is

25

not the province of a federal habeas court to reexamine state-court determinations on state-law

questions.  In conducting habeas review, a federal court is limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*,

502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780

(1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456

U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a

denial of due process.") (citation omitted)).

    Moreover, "a state court's interpretation of state law, including one announced on direct

appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v.

Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68).  A federal habeas court does

not function as an additional state appellate court reviewing state courts' decisions on state law

or procedure.  *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

    State-court rulings on issues of state law may, however, "rise to the level of due process

violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience

of our people as to be ranked as fundamental.'"  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir.

2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  But they must be "so egregious

that [they] result in a denial of fundamental fairness."  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th

Cir. 2003).  Fundamental fairness under the Due Process Clause is compromised where "the

action complained of . . . violates those 'fundamental conceptions of justice which lie at the base

of our civil and political institutions,' . . . and which define 'the community's sense of fair play

and decency.'"  *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal citations omitted).

Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'"  *Id*. (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

ANALYSIS

**A.    First Ground for Relief:  *Confrontation Clause***

For his first ground for relief, Johnson argues the trial court erred in admitting into evidence Miekal Gale's testimony that the night of the murder, Tamera Coleman told him that Johnson was on his way to Cleveland to harm Coates in retaliation for Coates' treatment of her. He alleges this testimony violated his constitutional right to confront a witness.  (Doc. No. 1-1 at 8-9.)

The last state court to address this claim was the court of appeals on direct review, which stated:

> {¶ 90} During direct examination, Gale testified about his reaction after learning that Johnson was coming to Cleveland:
>
> A: I asked her why she called him.
>
> Q: All right. And what was her reaction to you inquiring about why?
>
> A: She saying that he need to come [f * * *] him up. He need to learn a lesson.
>
> Q: And who is she referring to? A: Carlos.
>
> (Tr. 587  588.)
>
> Q: All right. Did you have conversation with    did Tamera make comments relative to this defendant coming to the Cleveland area or coming to where Carlos was?
>
> A: Yes.
>
> Q: What was the nature of any comment?

27

A: She stated where was he, how long was he gonna' be, and that she wanted him to [f * * *] him up. That was the exact words.

(Tr. 633.)

{¶ 91} In his second assignment of error, Johnson contends that the trial court erred in the admission of this evidence, in violation of defendant's right to confront witnesses, as protected by the Sixth and Fourteenth Amendments to the United States Constitution. Specifically, he contends that Gale's testimony regarding what Coleman told him about Johnson's purpose for driving to Cleveland was inadmissible hearsay.

{¶ 92} A trial court possesses broad discretion with respect to the admission of evidence, including the discretion to determine whether evidence constitutes hearsay and whether it is admissible hearsay. *State v. Graves*, 9th Dist. Lorain No. 08CA009397, 2009 Ohio 1133, ¶ 4. We review a trial court's decision regarding admissibility of evidence under an abuse of discretion standard. *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984).

{¶ 93} However, where no objection is raised to the admission of alleged hearsay testimony, it may be considered by the trier of fact for whatever probative value it may have. *Dudukovich v. Lorain Metro. Hous. Auth.*, 58 Ohio St.2d 202, 208, 389 N.E.2d 1113 (1979), citing *State v. Petro*, 148 Ohio St. 473, 76 N.E.2d 355 (1947), paragraph eight of the syllabus. Moreover, the failure to raise a timely objection at a time when the trial court can correct an error constitutes a waiver of any objection to the admissibility of evidence. Nevertheless, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). Thus, we review the admission of the alleged hearsay statements under the plain error standard of Crim.R. 52(B).

{¶ 94} Plain error consists of an obvious error or defect in the trial proceeding that affects a substantial right. Crim.R. 52(B). Therefore, plain error occurs only when, but for the error, the outcome of the trial clearly would have been different. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978); *State v. Hill*, 92 Ohio St.3d 191, 203, 2001 Ohio 141, 749 N.E.2d 274.

{¶ 95} Hearsay is an out-of-court statement offered for the truth of the matter asserted and is generally not admissible at trial. Evid.R. 801(C). However, pursuant to Evid.R. 801(D)(2)(e), "a statement is not hearsay if the statement is offered against a party and is * * * a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy."

28

{¶ 96} "'The statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof." ' *State v. Were*, 118 Ohio St.3d 448, 2008  Ohio  2762, 890 N.E.2d 263, ¶ 116, quoting *State v. Carter*, 72 Ohio St.3d 545, 1995  Ohio  104, 651 N.E.2d 965, paragraph three of the syllabus. Evid.R. 801(D)(2)(e) does not require that explicit findings of the conspiracy be made on the record. Were. "The premature admission of such a statement is harmless error if the state subsequently supplies the requisite independent proof of a conspiracy." *Carter* at 550, 651 N.E.2d 965.

{¶ 97} A prima facie case is made where the evidence introduced is sufficient to support, but not compel, a particular conclusion, and which only furnishes evidence that the jury may consider and weigh, but need not accept. *State v. Braun*, 8th Dist. Cuyahoga No. 91131, 2009 Ohio 4875, ¶ 107, citing *State v. Martin*, 9 Ohio App.3d 150, 458 N.E.2d 898 (11th Dist.1983), citing *Cleveland v. Keah*, 157 Ohio St. 331, 105 N.E.2d 402 (1952).

{¶ 98} "The proponent of the statement must establish: (1) the existence of a conspiracy; (2) the defendant's participation in the conspiracy; (3) the declarant's participation in the conspiracy; (4) that the statement was made during the course of the conspiracy; and (5) that the statement was in furtherance of the conspiracy." Braun at ¶ 108, citing *State v. Milo*, 6 Ohio App.3d 19, 451 N.E.2d 1253 (10th Dist.1982).

{¶ 99} In this case, the state set forth a prima facie case by independent proof of a conspiracy, at the very least, between Johnson and Coleman. Johnson participated in the conspiracy because he traveled to Cleveland at Coleman's request, and Coleman participated in the conspiracy because she orchestrated the events by calling Johnson. Green and Howard both testified that Coleman was calling and texting Johnson while they were in the Dog Pound bar after her confrontation with Coates. When Howard was asked how he knew she was calling Johnson, Howard responded, "cuz she was mad" and because Coates "had hit her." Green further testified that after Coates pushed Coleman up against a wall, Coleman stated "that Coates wanted to fight like a bitch," so she was going to call her "brother," who was later identified as Johnson.

{¶ 100} Coleman's statements to Gale were made in the course of the conspiracy because Coleman had already called Johnson to come to Cleveland; and the statement was made in furtherance of the conspiracy because it explained why Johnson was coming to Cleveland and would explain why Coleman was "calm," according to Gale. Additional evidence of a conspiracy existed because Coleman, her children, and Gale left the scene with Johnson after Coates was shot.

29

{¶ 101} Even if the admission of Gale's testimony regarding Coleman's statements was error, the jury heard testimony that Johnson approached Coates with a gun and admitted to shooting Coates. Therefore, Coleman's purpose in having Johnson come to Cleveland was irrelevant.

{¶ 102} As for Johnson's argument that this testimony violated his right to confrontation, this court explained in *Braun* that "the Confrontation Clause is not violated by the admission of statements made by a co-conspirator in furtherance of the conspiracy." *Braun*, 8th Dist. Cuyahoga No. 91131, 2009 Ohio 4875, ¶ 115 118. Furthermore, we note that Coleman, the declarant, testified at trial and was subject to cross-examination; thus, Johnson was able to confront Coleman about the statements she made to Gale.

*Johnson*, 2014 WL 2809013, at *15-17.

### 1. Cognizability

To the extent Johnson alleges trial-court error based on violations of Ohio evidentiary rules and case law, this claim is not cognizable on federal habeas review.[3]  Generally, "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review." *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012); *see also Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001) (noting that federal habeas courts "do not pass upon 'errors in the application of state law, especially rulings regarding the admission or exclusion of evidence.'" (quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988)).  Federal habeas courts presume that state courts correctly interpret state evidentiary law in their evidentiary rulings. *Small v. Brigano*, No. 04-3328, 2005 WL 1432898, at *5 (6th Cir. June 17, 2005.) Nevertheless, as explained above, state-court evidentiary rulings may "rise to the level of due

---

[3] Respondent does not contest the cognizability of this claim, but district courts are obligated to raise jurisdictional issues *sua sponte*. *See, e.g., Cmty. First Bank v. Nat'l Credit Union Admin.*, 41 F.3d 1050, 1053 (6th Cir. 1994) (issue of court's jurisdiction "is a qualifying hurdle that plaintiffs must satisfy even if raised *sua sponte* by the court"); *Clarke v. Mindis Metals, Inc.*, 99 F.3d 1138 (6th Cir. 1996) ("Neither party has raised the jurisdictional issue this case presents, but it is axiomatic that we must raise issues of subject matter jurisdiction sua sponte.").

process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).

Here, Johnson has not demonstrated that the challenged rulings resulted in a denial of fundamental fairness.  Indeed, as the state court correctly observed, "'the Confrontation Clause is not violated by the admission of statements made by a co-conspirator in furtherance of the conspiracy.'" *Johnson*, 2014 WL 2809013, at *17.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  In *Crawford v. Washington*, 541 U.S. 36, 59 (2004), the Supreme Court held that "this provision bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Davis v. Washington*, 547U.S. 813, 821 (2006) (quoting *Crawford*, 541 U.S. at 53  54).  The Court declined to give a precise definition of "testimonial."  *Crawford*, 541 U.S. at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (footnote omitted)).  However, circuit courts, including the Sixth Circuit, uniformly have held that statements made by a co-conspirator in furtherance of the conspiracy do not constitute testimonial hearsay under *Crawford*.  *See United States v. Stover*, 474 F.3d 904, 912  13 (6th Cir. 2007); *see also United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005); *United States v. Sanchez  Berrios*, 424 F.3d 65, 75 (1st Cir. 2005); *United States v. Jenkins*, 419 F.3d 614, 618

31

(7th Cir. 2005); *United States v. Logan*, 419 F.3d 172, 178 (2d Cir. 2005); *United States v. Robinson*, 367 F.3d 278, 292 n. 20 (5th Cir. 2004); *United States v. Reyes*, 362 F.3d 536, 541 n. 4 (8th Cir. 2004).  Moreover, as the state appellate court observed, Coleman testified at Johnson's trial and therefore was available for cross-examination regarding this testimony.

Accordingly, Johnson's confrontation-clause claim is not cognizable on federal habeas review.

### 2.    Procedural default

Respondent argues this claim is procedurally defaulted.  (Doc. No. 6 at 22-28.)  The Court agrees.

The state appellate court noted defense counsel's failure to object to the admission of Gale's challenged testimony and conducted a plain-error review of the claim.  *Johnson*, 2014 WL 2809013, at *15-17.  Ohio's contemporaneous objection rule requires that a party preserve an error for appeal by calling it to the attention of the trial court at a time when the error could have been avoided or corrected.  *State v. Mason*, 82 Ohio St. 3d 144, 162 (Ohio 1998); *State v. Glaros*, 170 Ohio St. 471 (Ohio 1960), paragraph one of the syllabus.  In "exceptional circumstances," however, Ohio courts may examine a claim that is otherwise waived due to the violation of a procedural rule    such as the contemporaneous objection rule    for "plain error," when "but for the error, the outcome of the trial clearly would have been otherwise."  *State v. Long*, 53 Ohio St. 2d 91, 96, 97 (Ohio 1978); *see also* Ohio R. Crim. P. 52(B) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").  Failure to adhere to the "firmly-established" contemporaneous objection rule is "an independent and adequate state ground" upon which to find federal habeas

32

claims procedurally defaulted.  *See, e.g., Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006).

Moreover, "the Ohio Supreme Court's plain error review does not constitute a waiver of the

state's procedural default rules and resurrect the issue . . . ."  *Id*.  This claim, therefore, is

procedurally defaulted.

Johnson argues his trial counsel's failure to object to the testimony at issue constitutes

cause to excuse the claim's default.  (Doc. No. 12 at 10-12.)  "Attorney error that constitutes

ineffective assistance of counsel is cause" to excuse the procedural default of a federal habeas

claim.  *Coleman v. Thompson*, 501 U.S. 722, 754 (1991).  However, as explained below with

regard to Johnson's claim of ineffective assistance of trial counsel, there was no attorney error

here.  And, as there was no deficient performance in failing to object to this testimony, there

was no ineffective assistance of trial counsel to excuse this claim's procedural default.  Johnson

also does not argue that he is actually innocent to excuse the default.

Johnson's first ground for relief, therefore, is both non-cognizable on federal habeas

review and procedurally defaulted, and the Court recommends that it be dismissed for those

reasons.

**B.**      **Second Ground for Relief:  *Prosecutorial Misconduct***

For his second ground for relief, Johnson claims the State violated his due process right

to a fair trial when the prosecutor altered, manipulated, and improperly used Johnson's cellular

telephone records during his closing argument.  (Doc. No. 1-1 at 9-12.)  Respondent argues this

claim lacks merit.  (Doc. No. 6 at 36-40.)

The state appellate court on direct review was the last state court to consider this claim,

reasoning:

{¶ 113} Johnson moved for a mistrial after the jury began deliberations on the basis that the prosecutor used the cell phone records for exactly what the trial court suggested should be avoided during closing arguments     the cellular towers and the significance of their locations. Johnson found issue not in the prosecutor pointing out the cell phone towers on the map, but that the prosecutor used the information to infer that Johnson was "lying in wait" to murder Coates.

> What is at issue is he said that, therefore, then can be interpreted as proof that the defendant lying in wait. And then looked at the jury and said, if a person lies in wait, it's premeditated, it's aggravated, it's murder. And I believe that that misconduct rises to the level of a mistrial.

(Tr. 967.)

{¶ 114} The trial court denied the motion, stating that it was most concerned that the cell phone records would be used to track Johnson's travel from Akron to Cleveland. Having found that the prosecutor did not use the records for this purpose, the court found no misconduct. Furthermore, the court noted the independent testimony that placed Johnson at the scene and that the testimony revealed he was there only for pickup purposes and not for any nefarious reasons, such as to commit a crime. Accordingly, the court found no material prejudice.

{¶ 115} In his fourth assignment of error, Johnson contends that "the trial court erred in failing to grant a mistrial due to prosecutorial misconduct, in violation of defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution."

{¶ 116} Specifically, Johnson contends that the state engaged in misconduct during closing argument when it used the cell phone records improperly by creating new demonstrative evidence by enlarging the phone records which, according to Johnson, were manipulations of the actual records. Johnson argues that these enlarged versions of the cell phone records included information provided by the state that caused them to be "labeled" and included a "legend" to interpret the calls, and "a map."

{¶ 117} The test for prosecutorial misconduct is whether the conduct was improper and, if so, whether it prejudicially affected the substantial rights of the accused. *State v. Jones*, 90 Ohio St.3d 403, 420, 2000  Ohio  187, 739 N.E.2d 300. The affect of the alleged misconduct must be judged in the context of the entire trial and not treated as an isolated incident in an otherwise properly tried case. *State v. Singleton*, 8th Dist. Cuyahoga No. 98301, 2013  Ohio  1440, ¶ 58. Accordingly, an appellate court should only reverse a conviction if the effect of the misconduct "permeates the entire atmosphere of the trial," such that the defendant has been denied a fair trial.

34

*Id.*, citing *State v. Tumbleson*, 105 Ohio App.3d 693, 696, 664 N.E.2d 1318 (12th Dist.1995). In analyzing whether a defendant was deprived of a fair trial, an appellate court must determine beyond a reasonable doubt whether, absent the improper conduct of the prosecutor, the jury would have found the defendant guilty. See *Maurer*, 15 Ohio St.3d at 266  267, 473 N.E.2d 768.

{¶ 118} While the enlarged cell phone records, manipulations thereof, and explanations were questionable, we cannot find the harm to Johnson, nor has Johnson explained how these enlargements were prejudicial or affected the outcome of the case. First, our review of the record shows that the state used the cell phone records to support its theory that Johnson's conduct was premeditated   with prior calculation and design, to prove their case for aggravated murder. The jury found Johnson not guilty of aggravated murder; thus, it can be necessarily inferred that they felt that Johnson's conduct was not premeditated, and any inference about him "lying in wait" was harmless.

{¶ 119} Morever, the defense theory of the case was that Johnson was present at Green's house that evening, but that he was not the shooter. Therefore, the route that Johnson took from Akron to Cleveland was irrelevant. Finally, because the jury acquitted Johnson of aggravated murder, Johnson's challenge to the trial court's denial of his request for a mistrial is without merit.

*Johnson*, 2014 WL 2809013, at *18-20.

The Supreme Court set forth the standard for claims of prosecutorial misconduct in habeas proceedings in *Darden v. Wainwright*, 477 U.S. 168 (1986).  It held that to prevail on such claims, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Id*. at 181 (internal quotation marks and citation omitted).  Rather, "'[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id*. (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  *See also United States v. Young*, 470 U.S. 1, 11 (1985) ("Nevertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context;

only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.").

The *Darden* standard "is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations . . . .'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Yarlborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Courts may consider: (1) whether the evidence against the defendant was strong; (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally. *Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012). "The prosecution necessarily has 'wide latitude' during closing argument to respond to the defense's strategies, evidence and arguments." *Id*. at 329 (quoting *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009)).

Prosecutorial-misconduct claims on federal habeas review are subject to harmless-error analysis under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Rosencrantz v. Lafler*, 568 F.3d 577, 580 (6th Cir. 2009). The *Brecht* test requires habeas courts to determine whether a constitutional error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623. There must be more than a "reasonable possibility" that the error was harmful. *Id*. at 637. "While a federal habeas court need not 'formal[ly]' apply both *Brecht* and '[AEDPA],'" to a state court's harmless-error analysis, "AEDPA nevertheless 'sets forth a precondition to the grant of habeas relief.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015) (quoting *Fry v. Piller*, 551 U.S. 112, 120 (2007)). Therefore, "'a federal

36

court may not award habeas relief under § 2254 unless *the harmlessness determination itself was unreasonable.*'" *Id*. at 2199 (quoting *Fry*, 551 U.S. at 119 (emphasis original)).

Johnson presents, almost verbatim, the same arguments here that he made in state court. (*See* Doc. No. 6-1, Exh. 12 at 55-59.)  His only criticism of the state appellate court's decision is that the court "did not directly address the issue" of the alleged prosecutorial misconduct other than finding it "questionable' and "harmless."[4]  (Doc. No. 12 at 17.)  But there is no Supreme Court precedent forbidding a court from declining to decide whether challenged prosecutorial conduct was improper if it first determines there was no resulting harm.  And other than a conclusory assertion that the alleged misconduct "was substantially injurious" (Doc. No. 12 at 18), Johnson has not shown, or even addressed, how the state court's harmlessness determination was unreasonable.  It was not.

The prosecutor's use of the cell phone records in his closing argument had no "substantial or injurious effect" on the jury's verdict.  As Johnson himself describes it, the prosecutor used this evidence "as some sort of map of Mr. Johnson's travel from 'the Akron area' to Cleveland."  (Doc. No. 12 at 14.)  It "support[ed] [the State's] theory that Johnson's conduct was premeditated   with prior calculation and design, to prove their case for aggravated murder."  *Johnson*, 2014 WL 2809013, at *20.  But, ultimately, this evidence of alleged premeditation did not help the State; the jury found Johnson not guilty of aggravated murder.

---

[4] Johnson also states, "The Ohio Court of Appeals applied an unreasonable application of the facts."  (Doc. No. 12 at 19.)  But he does not specify the basis for this claim or provide any legal or factual argumentation whatsoever in either his petition or traverse, and the Court will not address it.  *See, e.g., United States v. Crosgrove,* 637 F.3d 646, 663 (6th Cir. 2011) ("Because there is no developed argumentation in these claims, the panel declines to address [the defendant's] general assertions of misconduct in witness questioning and closing statements.").

Nor did the prosecutor's use of the cell phone records undermine Johnson's defense; Johnson's route to Cleveland was irrelevant to his claim that he was present at the scene of the murder but was not the shooter.

Johnson, therefore, has not shown that the state appellate court's decision was contrary to, or an unreasonable application of, *Darden*, *Brecht*, or any other Supreme Court precedent. The Court finds Johnson's second ground for relief meritless, and recommends that it be denied.

###   C.   Third Ground for Relief:   *Ineffective Assistance of Trial Counsel*

For his third ground for relief, Johnson argues that he was denied his Sixth Amendment right to the effective assistance of counsel when his trial counsel failed to object to: (1) the admission of Gale's testimony about what Coleman told him the night of the murder about Johnson's plans; (2) the jury instruction on flight; and (3) the prosecutor's improper remarks during closing argument.  (Doc. No. 1-1 at 12-13.)  Respondent contends this claim also lacks merit.  (Doc. No. 6 at 40-47.)

The state appellate court on direct appeal, the last state court to address these claims, stated:

> {¶ 121} In his fifth assignment of error, Johnson contends that he "was denied the effective assistance of counsel, in violation of his right to counsel, and defendant's right to due process of law, as protected by the Sixth and Fourteenth Amendments to the United States Constitution."

> {¶ 122} Johnson claims his counsel was ineffective for failing to object to (1) the hearsay testimony, which was his second assigned error; (2) the jury instruction on flight, which was his third assigned error; and (3) the state's closing argument, which was his fourth assigned error.

> {¶ 123} To establish ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonable representation and that he was prejudiced by that performance. *State v. Drummond*, 111 Ohio St.3d 14, 2006 Ohio 5084, 854 N.E.2d 1038, ¶ 205, citing

38

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 124} Johnson first claims his counsel was ineffective for failing to object to hearsay testimony. As discussed in his second assignment of error, the testimony was admissible as non-hearsay because it was made by a co-conspirator. Therefore, counsel's failure to object would have been futile.

{¶ 125} Nevertheless, a review of the record demonstrates that counsel did object when the state attempted to question Gale again about Coleman's statements. See tr. 632. However, after a side-bar discussion, counsel withdrew his objection. On cross-examination, counsel explained why he withdrew his objection    as a strategic tactic to support the defense theory that Gale actually called Johnson that evening. See tr. 640. According to the defense, the cell phone records indicated that Gale's phone was used to call Johnson, and although the state argued that Coleman was using Gale's phone while seated in Gale's car, Gale's records further showed that the calls were being made to Johnson prior to Coleman allegedly using Gale's phone. Accordingly, we find counsel's failure to object or his subsequent withdrawal of the objection was for strategic purposes; thus, it cannot be deemed as ineffective.

{¶ 126} Johnson contends counsel was also ineffective for failing to object to the jury instruction. As discussed under Johnson's second assignment of error, the trial court erred in instructing the jury on flight because the evidence did not support such instruction; therefore, an objection to that instruction would not have been futile. However, the error was harmless considering the instruction as a whole allowed for the jury to conclude that Johnson's departure from the scene was motivated by other factors, including that Gale had been stabbed or to remove Coleman's children from the scene.

{¶ 127} In his final argument, Johnson maintains counsel was ineffective for failing to object to the state's closing argument, specifically about the cell phone records. Johnson also contends that counsel should have requested a curative instruction after their use in closing argument. As discussed under Johnson's fourth assignment of error, the state was unsuccessful in its use of the enlarged cell phone records. Therefore, the failure to object was harmless.

{¶ 128} Moreover, counsel's request for a curative instruction at that point would have been prejudicial. Asking for a curative instruction would have heightened the juror's awareness of the significance of the cell phone records and their importance in proving premeditation. Rather, counsel acted appropriately in requesting a

39

mistrial based on the perceived prejudicial effect of the enlarged and summarized cell phone records.

{¶ 129} Based on the record before this court, we cannot say that Johnson was denied the effective assistance of counsel to the extent that he was prejudiced and the result of the trial would have been different. Johnson's fifth assignment of error is overruled.

*Johnson*, 2014 WL 2809013, at *20-21.

The Supreme Court long has recognized that the Sixth Amendment right to the effective assistance of counsel at trial "is a bedrock principle in our justice system." *Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012). *See also Gideon v. Wainwright*, 372 U.S. 335, 342-44 (1963). The Court announced a two-prong test for habeas claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687. Second, the petitioner must show that he or she was prejudiced by counsel's errors. To do this, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

"*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (quoting *Strickland,* 466 U.S. at 689-90). The Supreme Court has observed that the standards imposed by *Strickland* and § 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so." *Harrington v. Richter,* 562 U.S. 86, 105 (2011).

As to counsel's duty to object at trial, the Sixth Circuit has explained:

> Because of the "numerous potentially objectionable events" that occur throughout trial, we have previously noted that "any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."

*Hodge v. Haeberlin*, 579 F.3d 627, 648 (6th Cir. 2009) (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006)).

Here, none of the omissions of which Johnson complains rises to the level described in *Hodges*, nor do they meet that standard when considered together.  As to Johnson's first sub-claim, the state court reasonably concluded that defense counsel's failure to object to Gale's testimony about what Coleman told him about Johnson's plans to travel to Cleveland did not constitute deficient performance.  First, although Johnson describes the testimony at issue as "extremely damaging and improper," it was nonetheless admissible.  The state court found it admissible under state evidentiary rules, a finding to which this Court must defer.  *See, e.g., Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012) ("alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review").  And, as explained above, the state court correctly noted that the testimony did not violate the Confrontation Clause.  It is self-evident, therefore, that counsel was not ineffective for failing to make a baseless, futile objection.  Second, the state court reasonably pointed out that counsel did in fact object to this testimony when the State attempted to revisit the subject of Coleman's statements about Johnson in examining Gale, but withdrew the objection for strategic reasons.  The Supreme Court stated in *Strickland* that "strategic choices made after thorough investigation of law and

41

facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Johnson's first ineffective-assistance sub-claim is meritless.

Johnson's second sub-claim, attacking his counsel's failure to object to the jury instruction on flight, also fails.  The state appellate court determined that the trial court erred in giving this jury instruction, but the error was harmless.  *See Johnson*, 2014 WL 2809013, at *17-18.  This Court must defer to that finding, as jury instructions are generally issues of state law.  *See, e.g., Bagby v. Sowders*, 894 F.2d 792, 795 (6th Cir. 1990) (finding state court's conclusion that jury instruction was unwarranted was "axiomatically correct, as a matter or state law[,]" as "the circumstances that would induce a federal court to overturn the state court determination would need to be extraordinary, indeed").  And if the jury instruction did not harm Johnson, it follows that counsel's failure to object to the instruction did not prejudice him. The state court's rejection of this claim was reasonable.  *See Strickland,* 466 U.S. at 687 (stating if a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail).

Finally, the state court reasonably denied Johnson's third ineffective-assistance sub-claim that counsel was ineffective for failing to object to the prosecutor's use of cell phone records in his closing argument.  As discussed above, the state court reasonably determined that the prosecutor's conduct constituted harmless error.  Again, therefore, counsel's failure to object to that conduct also was harmless.

Accordingly, Johnson's claim of ineffective assistance of trial counsel was neither contrary to, nor an unreasonable application of, *Strickland*, and the Court recommends that Johnson's third ground for relief be denied.

42

**D.      Fourth Ground for Relief:  *Cumulative Errors***

Johnson's fourth ground for relief asserts the trial court, prosecutor, and trial counsel

violated his due process rights through their alleged cumulative errors "as detailed" in his

petition.  (Doc. No. 1-1 at 14-15.)  The Sixth Circuit has held, however, that "the law of this

Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court

has not spoken on this issue."  *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *see*

*also Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005); *Sheppard v. Bagley*, 657 F.3d 338,

348 (6th Cir. 2011).  The Court recommends, therefore, that this ground for relief be dismissed

as failing to state a claim that is cognizable on federal habeas review.

### CONCLUSION AND RECOMMENDATION

For the reasons stated above, the Court recommends that Petitioner Edwardlee

Johnson's petition for writ of habeas corpus (Doc. No. 1) be DISMISSED in its entirety,

because the claims raised are non-cognizable, procedurally defaulted, and/or meritless.


Date:   November 15, 2017                                     *s/ Jonathan Greenberg*
                                                             Jonathan D. Greenberg
                                                             United States Magistrate Judge


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**